IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | ) | CV. NO. 5:14-CV-000022-DAE |
| | ) | Bankr. No. 12-50073-a998 |
| DELTA PRODUCE, LP, et al., | ) | |
| | ) | |
| Debtors, | ) | |
| _____ | ) | |
| | ) | |
| KINGDOM FRESH PRODUCE, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| vs. | ) | |
| | ) | |
| BEXAR COUNTY, et al., | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER VACATING THE BANKRUPTCY
COURT'S ORDER GRANTING SPECIAL PACA TRUST COUNSEL'S THIRD
<u>INTERIM APPLICATION FOR ATTORNEY'S FEES</u>**

Before the Court is an appeal from the bankruptcy court's order

granting Special PACA Counsel Craig A. Stokes ("Special Counsel") his Third

and Final Fee Application brought by Appellants Kingdom Fresh Produce, Inc., I.

Kunik Company, Inc., Five Brothers Jalisco Produce Co. Inc. d/b/a Bonanza 2001,

Rio Bravo Produce Limited, LLC, and G.R. Produce, Inc. (collectively, "Kingdom

1

Fresh").  For the reasons that follow, the Court **VACATES** the bankruptcy court's order granting Special Counsel's Third and Final Fee Application.

<u>BACKGROUND</u>

This matter arises from the appointment of a Special Counsel to adjudicate claims made pursuant to the Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. § 499(a)–(t).  This matter incorporates three PACA lawsuits that were filed in the United States District Courts for the Western District of Texas against Delta Produce LP ("Delta Produce"), a local produce company.

On January 3, 2012, Delta Produce filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas.  (Bankr. Dkt. # 1.)[1]  Delta then moved to impose an automatic stay of the three lawsuits pending in district court under 11 U.S.C. § 362.  (Case No. 1:11-cv-01114-SS, Dkt. ## 24, 26.)  Two days later, Delta Produce asked the district court to abate its proceedings and allow various creditors, including PACA creditors, to assert their claims before the Bankruptcy Court in San Antonio.  (<u>Id.</u>)  Upon receipt of Delta Produce's motion and several PACA claimants consent, the district court referred the case to the bankruptcy court in San Antonio, noting that "the parties apparently agree that the Bankruptcy

---

[1] Except as otherwise noted, all citations are to the bankruptcy docket in Case No. SA:12-BK-50073-LMC.

Court would be the appropriate and preferable place to adjudicate the claims presented in this case."  (Case No. 5:12-cv-00046-XR, Dkt. # 28.)

After the PACA claims were referred to the bankruptcy court, Delta Produce filed a proposed PACA Claim Procedure in bankruptcy court on January 19, 2012, which included the appointment of Special Counsel Craig A. Stokes ("Special Counsel") to adjudicate PACA claims.  (Bankr. Dkt. # 31.)  Several PACA claimants—but not Appellants Kingdom Fresh—agreed to the motion.[2]  On January 24, 2012, the bankruptcy court held a hearing to consider a Motion for Orders Establishing a Deadline to File PACA Trust Claims and for Procedures to Resolve those Claims and for the Appointment of Special Counsel.  (See Special Counsel Appointment Hr'g, Jan. 24, 2012, Bankr. Dkt. # 31.)  Kingdom Fresh was present at that hearing, but did not address the bankruptcy court.

The following day on January 25, 2012, the bankruptcy court issued an order establishing a deadline to file PACA trust claims, for procedures to resolve those claims, and for the appointment of Special PACA Counsel (the "PACA Order").  (Bankr. Dkt. # 52.)  The PACA Order specifically directing Special Counsel to inform all of Delta Produce's creditors that had not already joined the litigation of the PACA claims procedure.  (Id. at 2 ("On or before

---

[2] The PACA Claimants that did agree to the motion include: Wilson Davis Co.; Averrit Brokerage Co., Inc.; A&A concepts, LLC; Greenhouse Produce Company, LLC; Juniper Tomato Grower, Inc.; Mecca Family Farms, Ltd.; London Fruit, Inc.; Triple H Produce, LLC; and The Pumpkin Patch, LLP.  (Bankr. Dkt. # 31 at 9.)

February 11, 2012, the Court-appointed Special PACA Counsel for the Debtor,

Craig A. Stokes ('Special PACA Counsel'), shall mail a copy of this Order by

certified mail, return receipt requested, to all entities listed on DELTA's Accounts

payable schedule.").)  Special Counsel was also tasked with preserving and

collecting PACA trust assets, negotiating and compromising debts owed by an

account holder of Delta Produce, considering and reviewing claims asserted under

the PACA trust, and providing status reports to PACA creditors.  (Id. at 8–10.)

With regard to Paragraph 15(b) of the order specified:

> Special PACA Counsel shall be "entitled" to paid attorney's fees and
> costs from the PACA trust funds for the services rendered pursuant to
> this Order.  The Court will determine the reasonable "amount" of such
> attorney's fees and costs.  To be paid, Special PACA Counsel shall
> file a motion(s) for attorney's fees and costs, [and] should attach time
> sheets that have reasonably detailed time entries and which reflect
> time in increments of ".1" of an hour.  Stokes may file interim
> motions for attorney's fees and costs.

(Id. at 10–11 (emphasis added).)  No party objected to the PACA Order.

After the PACA Order established the timeline for adjudicating

PACA claims, Delta Produce informed potential PACA creditors of the pending

PACA claim procedure.  From January to March 2012, PACA Creditors filed

claims against Delta Produce totaling $1,676,015.25.  Special Counsel negotiated

PACA claims with Delta Produce and its PACA creditors.

On August 14, 2012, Special Counsel filed its First Interim

Application for attorney fees.  (Bankr. Dkt. # 284.)  He sought $95,978.00 in

attorney fees and $2,492.97 in expenses for work completed between January 3, 2012, and August 7, 2012, to be paid from the PACA trust.  (Id.)

PACA Claimant Kingdom Fresh objected to Special Counsel's First Interim Application on the ground that the PACA trust funds should not be used to pay Special Counsel's fees.  (Bankr. Dkt. # 294.)  Kingdom Fresh argued that (1) the Bankruptcy Court lacked subject-matter jurisdiction to use non-estate assets beyond the reach of bankruptcy powers to satisfy the administrative expense claims against the bankruptcy estate, (2) the PACA trust assets that Delta Produce held could not be used to pay Special Counsel's fees (nor Delta Produce's attorney's fees), and (3) Delta Produce's Counsel already had a pre-existing duty to collect the Debtors' accounts receivable and thus Special Counsel could not be paid with PACA trust funds.  (Id.)

On September 21, 2012, the bankruptcy court held a hearing to consider Special Counsel's First Interim Application for attorney fees.  (See "First Interim Fee Hr'g, Sept. 21, 2012," Bankr. Dkt. # 381.)  Over Kingdom Fresh's objections, the bankruptcy court granted Special Counsel's First Interim Application for attorney fees on September 25, 2012.  (Bankr. Dkt. # 320.)  On October 9, 2012, Kingdom Fresh timely filed an appeal, arguing that the bankruptcy court lacked jurisdiction to award such fees and PACA forbid paying Special Counsel's fees.  (Bankr. Dkt. # 340; Case No. 5:12-cv-1127, Dkt. # 1.)

On November 14, 2012, Special Counsel filed his Second Interim Application for Fees. (Bankr. Dkt. # 404.) Kingdom Fresh objected again for the same reasons as their objection to Special Counsel's First Interim Fee Application. (Bankr. Dkt. # 427.) On December 13, 2012, the bankruptcy court granted Special Counsel's Second Interim Fee Application. (Bankr. Dkt. # 443.) On December 21, 2012, Kingdom Fresh filed their Notice of Appeal. (Bankr. Dkt. # 449.) Kingdom Fresh and Special Counsel subsequently agreed that the outcome of the First Appeal would be binding on the second appeal, and on March 12, 2013, this Court signed an agreed order consolidating the appeal of the First Interim Fee Application with the appeal for the Second Interim Fee Application. (Case No. 5:13-cv-131, Dkt. # 7.)

On August 30, 2013, Special Counsel filed his Third and Final Fee Application. (Bankr. Dkt. # 575.) On September 20, 2013, Kingdom Fresh objected to Special Counsel's Third and Final Fee Application, arguing that in addition to the reasons enumerated in their earlier appeals, Special Counsel had an actual conflict of interest under 11 U.S.C. § 328(c). (Bankr. Dkt. # 586.)

On September 27, 2013, this Court affirmed in part and vacated in part the bankruptcy court's order granting Special Counsel's First Interim Fee Application.[3] (Case No. 5:12-cv-1127, Dkt. # 23.) The court held that the

---

[3] Per the parties' agreement, this Order was also binding on Kingdom Fresh's

bankruptcy court did have jurisdiction and adjudicative authority to award Special Counsel his attorney's fees.  (Id. at 9–19.)  However, the bankruptcy court erred in granting his fees because PACA does not authorize paying such fees until all PACA trust beneficiaries, as holders of a "superpriority" status, have been paid. (Id. at 21–26.)[4]

On November 18, 2013, Kingdom Fresh filed a notice of appeal of the bankruptcy court's order granting Special Counsel his Third and Final Fee Application.  (Bankr. Dkt. # 616.)  On January 27, 2014, Kingdom Fresh filed its briefing.  ("Opening Br.," Dkt. # 10.)  On February 10, 2014, Special Counsel filed his brief.  ("Answering Br.," Dkt. # 11.)  On February 24, 2014, Kingdom Fresh filed its Reply Brief.  ("Reply Br.," Dkt. # 12.)  On May 21, 2014, Amicus Curiae Randolph N. Osherow ("Amicus") submitted an Amicus Brief in support of Special PACA Counsel's Third and Final Fee Application.  ("Amicus Br.," Dkt. # 14.)

---

appeal of Special Counsel's Second Interim Fee Application.  (See Case No. 5:13-cv-131, Dkt. # 7.)

[4] Special Counsel subsequently filed a Motion for Reconsideration of the Court's ruling.  (Case No. 5:12-cv-1127, Dkt. # 24.)  For the same reasons as expressed infra, the Court denied the Motion for Reconsideration.  (Case No. 5:12-cv-1127, Dkt. # 42.)

DISCUSSION

Kingdom Fresh advances two arguments in support of its appeal: (1) for the reasons enumerated in this Court's earlier Order denying Special Counsel's First (and Second) Interim Fee Applications, PACA does not permit PACA trust assets to satisfy Special Counsel's fees, and (2) Special Counsel's actions created an actual conflict of interest against the debtor's estates sufficient to deny any and all compensation under 11 U.S.C. § 328(c).

This Court has already issued two orders explaining how and why PACA does not authorize payment of Special Counsel's fees at this time (see Case No. 5:12-cv-1127 Dkt. ## 23, 42); however, in the interest of clarity and thoroughness, the Court will endeavor to comprehensively explain why PACA forbids such a payment until the satisfaction of the PACA beneficiaries' claims.

I.    PACA's Background

The Court begins by setting out the legal landscape for PACA claims generally.  In 1930, Congress enacted PACA to regulate the produce industry and promote fair dealings in transactions involving fruits and vegetables.  Golman-Hayden Co. v. Fresh Source Produce Inc., 217 F.3d 348, 350 (5th Cir. 2000).  As stated in the House Report to the 1984 amendments to the Act, PACA was enacted

> to encourage fair trading practices in the marketing of perishable
> commodities by suppressing unfair and fraudulent business practices
> in marking of fresh and frozen fruits and vegetables . . . and providing

8

for collecting damages from any buyer or seller who fails to live up to his contractual obligations.

H.R. Rep. No. 543, 98th Cong., 2d Sess. 3 (1983); see also Pac. Intern. Mktg., Inc. v. A & B Produce, Inc., 462 F.3d 279, 282 (3d Cir. 2006) ("Congress intended PACA to protect small farmers and growers who were vulnerable to the practices of financially irresponsible buyers.").

   To this end, PACA requires buyers of produce to make "full payment promptly," Bocchi Americas Assocs. Inc. v. Commerce Fresh Mktg. Inc., 515 F.3d 383, 387–88 (5th Cir. 2008) (quoting 7 U.S.C. § 499b(4)), and if a buyer fails to tender prompt payment, the seller may file a complaint with the United States Department of Agriculture or file a civil suit against the buyer, id. (citing 7 U.S.C. § 499e(a)–(b)).  In other words, "[u]nder PACA, it is unlawful for buyers of produce, inter alia, to fail to make prompt payment for a shipment of produce." Pac. Intern. Mktg, Inc., 462 F.3d at 282 (quoting Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 199 (3d Cir. 1998)).

   Congress later amended PACA to add two powerful tools to address buyers' proclivity to default before tendering full payment to sellers.  First, PACA established a scheme in which a buyer of produce on credit is required to hold the produce and its derivatives and/or proceeds in trust for the unpaid seller.  7 U.S.C. § 499e(c)(2); Endico Potatoes v. CIT Group/Factoring, 67 F.3d 1063, 1067 (2d Cir. 1995) (holding that PACA incorporates ordinary principles of trust law so that a

9

buyer holds legal title to the produce and its derivatives, but the seller retains an equitable interest in the trust property pending payment); see also Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc., 336 F.3d 410, 413 (5th Cir. 2003) (holding that § 499e(c)(2) creates, "immediately upon delivery, a nonsegregated 'floating' trust in favor of sellers on the perishable commodities sold and the products and proceeds derived from the commodities"). "Congress provided this remedy because 'prior to this amendment, unpaid produce suppliers were unsecured creditors vulnerable to the buyers' practice of granting other creditors a security interest in their inventory and accounts receivable." Pac. Intern. Mktg., 462 F.3d at 282 (quoting Idahoan Fresh, 157 F.3d at 199). Thereafter, the buyer becomes the seller's trustee and holds the assets in trust for the seller.

Second, "if the seller is not paid promptly, the buyer must preserve trust assets, and the seller has a 'superpriority' right that trumps the rights of the buyer's other secured and unsecured creditors." Bocchi Americas Assocs. Inc., 515 F.3d at 388; accord 7 U.S.C. § 499e(c)(1); see also Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997) ("The PACA grants the sellers of such commodities the right to recover against the purchasers and puts the sellers in a position superior to all other creditors.").[5]

---

[5] Sellers are only entitled to the trust assets and "superpriority" status if they

"General trust principles govern PACA trusts unless the principle conflicts with PACA."  <u>Nickey Gregory Co., LLC v. AgriCap, LLC</u>, 597 F.3d 591, 595 (4th Cir. 2010); <u>accord</u> <u>C.H. Robinson v. Alanco Corp.</u>, 239 F.3d 483, 487 (2d Cir. 2001) ("Trusts created under PACA are statutory trusts, and common law trust principles are not applicable if they conflict with the language of the statute, the clear intent of Congress in enacting the statute, or the accompanying regulations."); <u>Sunkist Growers, Inc. v. Fisher</u>, 104 F.3d 280, 282 (9th Cir. 1997).   Because trust principles apply and the debtor only holds legal—not equitable—title, if the debtor files for bankruptcy, the PACA trust assets are excluded from the bankruptcy estate.  <u>See, e.g.</u>, 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, . . . becomes property of the estate . . . only to the extent of the debtor's legal title to

---

comply with certain procedural requirements. An unpaid seller must demonstrate that:

> (1) the commodities sold were perishable agricultural commodities;
> (2) the purchaser of the perishable agricultural commodities was a commission merchant, dealer or broker;
> (3) the transaction occurred in interstate or foreign commerce;
> (4) the seller has not received full payment on the transaction; and
> (5) the seller preserved its trust rights by giving written notice to the purchaser within the time provided by law.

7 U.S.C. § 499e.  If a seller satisfies § 499e's requirements, however, a trust automatically arises in favor of the seller until full payment has been received.  <u>Id.</u> § 499e(c)(2); <u>see also</u> <u>In Re Milton Poulos, Inc.</u>, 947 F.2d 1351, 1352 (9th Cir. 1991).

11

such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); Ruby Robinson Co., Inc. v. Herr, 453 F. App'x 463, 465 (5th Cir. 2011) ("Ordinary principles of trust law apply to trusts created under PACA, so that for instance the trust assets are excluded from the estate should the dealer go bankrupt." (quoting Sunkist Growers, Inc., 104 F.3d at 282)).

II.    Special Counsel is Not Entitled to Attorney's Fees Until Satisfaction of the PACA beneficiaries' claims

    i.    PACA Statute entitles PACA Beneficiaries to a Sum Certain

        The trust provision of PACA requires a produce buyer to hold the produce and its proceeds and derivatives in trust for the benefit of the seller "until full payment of the sums owing in connection with such transactions has been received" by the unpaid seller.  7 U.S.C. § 499e(c)(2).  As the Second Circuit noted, "[i]t is clear from the language of PACA that beneficiaries are entitled to full payment of the contract price for the sale of produce."  C.H. Robinson Co., 239 F.3d at 487; accord Anthony Marano Co. v. MS-Grand Bridgeview, Inc., 08 C 4244, 2010 WL 5419057 (N.D. Ill. Dec. 23, 2010); Pac. Intern. Mktg., 462 F.3d at 285.

        In fact, a "trust created by PACA exists until a seller [i.e., PACA beneficiary] is paid in full."  Weis-Buy Servs. v. Paglia, 411 F.3d 415, 423 (3d Cir. 2005) (citing 7 C.F.R. § 46.46(c)(2)); see also In re Kornblum & Co., Inc., 81 F.3d 280, 285 (2d Cir. 1996) ("Only when every existing beneficiary has been paid in

12

full does the PACA trust cease to exist and the Produce Debtor become the equitable owner of any remaining trust assets.").

In <u>C.H. Robinson</u>, the Second Circuit seized upon the aforementioned language of the PACA statute to hold that an PACA did not authorize payment of a PACA trustee's attorney's fees because "PACA trust beneficiaries are entitled to full payment before trustees may lawfully use trust funds to pay other creditors," like the trustee's attorney's fees.  239 F.3d at 488.  There, Robinson, a produce seller, filed a PACA claim to recover more than $200,000 in unpaid produce purchases from the bankrupt Alanco Corp., a produce buyer.  <u>Id.</u> at 485.  When Robinson settled his PACA trust claim with Alanco, Mark Mandell, acting as trustee for the PACA trust, turned over the remaining proceeds Alanco had left to Robinson, but withheld $18,960.57.  <u>Id.</u>  Mandell then applied to the district court to enforce an attorney's lien on the $18,960.57.  <u>Id.</u>  The district court denied Mandell's motion.  <u>Id.</u>

On appeal to the Second Circuit, Mandell argued that he was entitled to the $18,960.57 sum as payment for fees he earned performing necessary services to collect Alanco's accounts receivable, which had been held in trust for the benefit of Robinson under PACA.  <u>Id.</u> at 486.  He also contended that his services were in fulfillment of Alanco's duty to the PACA trust beneficiaries and solely for their benefit and that therefore he was entitled to be paid out of the trust

res under general principles of trust law.  Id.

The Second Circuit disagreed.  The court acknowledged that "black-letter trust law" provides that a "trustee can properly incur expenses which are necessary and appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust."  Id. (quoting Restatement of Trusts (Second) § 188 (1957)).  But the court considered PACA meaningfully different, finding that "[t]rusts created under PACA are statutory trusts, and common law trust principles are not applicable if they conflict with the language of the statute, the clear intent of Congress in enacting the statute, or the accompanying regulations."  Id. at 487. In fact, the only reason Congress labeled PACA claims as "trusts," the court reminded, was to strengthen a produce seller's contractual rights in a defunct buyer's bankruptcy proceeding.  Id. (citing H.R. Rep. No. 543, 98th Cong. 2d Sess. 3 (1983) (explaining that given the proclivity for buyers to enter bankruptcy, PACA was intended to "increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities" in bankruptcy proceedings)).

The court also relied on PACA's accompanying regulations, which directed that PACA trustees have a duty under PACA to pay the full amount of the debt owed to PACA claimants before paying any other creditors (i.e., attorneys). Id. at 487–88.  The court first referenced 7 C.F.R. § 46.46(a)(2), which defined "dissipation" of trust assets as "any act or failure to act which could result in the

14

diversion of trust assets or which could prejudice or impair the ability of unpaid [sellers] to recover money owed in connection with produce transactions." Id.  The court then cited 7 C.F.R. § 46.46(d), which stated that "[c]omission merchants, dealers, and brokers are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations of perishable agricultural commodities."  Id. at 488.

The court concluded that because Mandell's withholding of the $18,690.57 in attorney's fees left Alanco unable to satisfy the remainder of Robinson's PACA claim, he impaired Robinson's ability to recover the money owed under PACA.  Id.  In other words, the court explained, "[a]llowing a defunct PACA trustee to pay other creditors [i.e., their attorneys] with PACA funds before the seller [PACA claimant] is paid in full would frustrate [Congress's] purpose, and would be contrary to the language of PACA and its accompanying regulations."  Id.  Mandell, as the PACA trustee, was not able to use PACA funds to pay himself his earned attorney fees incurred in collecting accounts receivable held in trust for Robinson.  Id. at 488–89.

Although Special Counsel Stokes is not a PACA trustee like Mandell,[6] the logic of C.H. Robinson equally applies.  The Second Circuit's

---

[6] Special Counsel is correct that he was not technically the PACA Trustee because 7 U.S.C. § 499e(c)(2) provides that the defunct buyer, Delta Produce, is the trustee, and therefore Delta Produce's lawyer functions as the "trustee" by holding legal

reasoning did not rely on Mandell's trustee-status.  Rather, the court looked to "the language of the [PACA] statute itself," noting:

> The trust provision of PACA requires a produce buyer to hold the produce and its proceeds and derivatives in trust for the benefit of the seller "until full payment of the sums owing in connection with such transactions has been received" by the unpaid seller.  7 U.S.C. § 499e(c)(2).  <u>It is clear from the language of PACA that beneficiaries are entitled to full payment of the contract price for the sale of produce</u>.  Unlike most common law trusts, a <u>PACA trust entitles the trust beneficiary to a sum certain</u>. The trust requirement is intended to supplement the seller's contract rights.

239 F.3d at 487 (emphases added).  Mandell's trustee-status was not dispositive.

The court made clear that PACA intended the beneficiaries (or sellers) to <u>fully recover</u> before the debtor (buyer), as the PACA trustee, paid <u>any other creditors</u>.

<u>See</u> <u>id.</u> at 488 ("Allowing a defunct PACA trustee to pay other creditors with PACA funds before the seller is paid in full would frustrate this purpose, and would be contrary to the language of PACA and its accompanying regulations.

PACA trust beneficiaries are entitled to full payment before trustees may lawfully use trust funds to pay other creditors.").  In other words, the status of any other individual seeking PACA trust funds is irrelevant; PACA trust beneficiaries must be paid first before any other creditors can be paid because they are entitled to "full payment."  And because paying Mandell's attorney's fees would not have allowed the PACA trust beneficiaries to receive full payment, Mandell was not entitled to

---

title to the goods for the benefit of the sellers, like Kingdom Fresh and other PACA Claimants.

16

such fees from PACA trust funds.

 Other courts share <u>C.H. Robinson</u>'s reading, namely that PACA trust beneficiaries are entitled to full payment.  <u>See, e.g.</u>, <u>Chiquita Fresh N. Am., LLC v. Long Island Banana Corp.</u>, 14-CV-982 ADS AKT, 2014 WL 2854483, at *3 (E.D.N.Y. June 23, 2014) (holding that a PACA trust "is continuous and exists from the moment produce is received until all suppliers are <u>paid in full</u>" (emphasis added) (quoting <u>Ger–Nis Int'l, LLC v. FJB, Inc.</u>, 07–cv–898 (CM), 2008 WL 2600074, at *4 (S.D.N.Y. June 25, 2008))); <u>J.A. Besteman Co. v. Carter's, Inc.</u>, 439 F. Supp. 2d 774, 778 (W.D. Mich. 2006) ("[A] PACA trust arises when the first PACA debt is incurred and continues thereafter until all sellers are paid in full." (emphasis added)).

 While § 499e(b)(2)'s "full payment" requirement may seem unforgiving, it was purposeful.  In the early 1980s, Congress recognized a more significant payment problem in the produce industry.  1984 U.S.C.C.A.N. at 406; <u>see also</u> <u>Frio Ice, S.A. v. Sunfruit, Inc.</u>, 918 F.2d 154, 156 (11th Cir. 1990) ("In the early 1980s, Congress determined that the increase in non-payment and delinquent payment by produce dealers threatened the financial stability of produce growers.").  Congress recognized that "due to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the

seller is unable to verify." Endico Potatoes, 67 F.3d at 1067; see also Middle

Mountain Land and Produce Inc. v. Sound Commodities Inc., 307 F.3d 1220, 1223

(9th Cir. 2002) ("Unfortunately, PACA as originally drafted was unable to provide

complete protection to sellers. . . . If the buyer then declared bankruptcy, the seller

would have 'no meaningful possibility' of receiving its contractual right to

payment.").

   To remedy this problem, in 1984, Congress amended PACA by

creating a statutory trust "to increase the legal protection for unpaid sellers and

suppliers of perishable agricultural commodities until full payment of sums due

have been received by them." 1984 U.S.C.C.A.N. at 406. The 1984 PACA

Amendments further provided that the failure to maintain the PACA Trust and

make full payment promptly to the trust beneficiary is unlawful, 7 U.S.C.

§ 499b(4), and PACA buyers were then "required to maintain trust assets in a

manner that such assets are freely available to satisfy outstanding obligations to

sellers of perishable agricultural commodities," and any act or omission

inconsistent with this responsibility, including dissipation of trust assets, is

proscribed, 7 C.F.R. § 46.46(d)(1). In short, PACA's statutory text unequivocally

requires that PACA trust assets must be used to pay the sellers of PACA goods

ahead of all other creditors.

   Turning to the instant facts, it is undisputed that Special Counsel's

fees would be paid by PACA trust assets, thus diminishing the amount of the trust assets to the detriment of the PACA beneficiaries like Kingdom Fresh.  Because the bankruptcy court granted Special Counsel's Third and Final Fee Application and the PACA beneficiaries had not received "full payment of the sums owning in connection with such [PACA] transactions," 7 U.S.C. § 499e(c)(2), the bankruptcy court's order violated the terms of the PACA.

However, to be clear, Special Counsel <u>could</u> be entitled to payment of his fees—but only after the PACA beneficiaries, like Kingdom Fresh, received "full payment."  Any action before PACA trust beneficiaries receive full payment would directly violate the language of PACA and its regulations.  See <u>C.H. Robinson</u>, 239 F.3d at 488.

Special Counsel argues that <u>C.H. Robinson</u> is distinguishable because unlike Mandell, he was appointed by the bankruptcy court.  (Answering Br. at 22–23.)  Special Counsel cites the <u>trial court order</u> in <u>C.H. Robinson</u>, as that court noted the possibility of compensating Mandell if Robinson had agreed:

> Mandell's claim that Robinson's counsel did not seek to take over the representation of Alanco and did not object to Mandell's statement that he would take his fee from the PACA trust assets, are insufficient to overcome the policies behind the PACA trust.  Mandell is now asking that Robinson's money be spent on his fee; but if Robinson wanted to retain him to collect Alanco's PACA funds for Robinson's benefit, it would have done so.  Robinson's counsel silence did not amount to a promise to allow Mandell to recover his fees from the Robinson's PACA trust.  <u>Moreover, if Mandell really had been concerned at whether he would be paid from Alanco's PACA trust</u>

19

<u>funds, he could have moved early in these cases, rather than at their
conclusion for a ruling on the attorney fee lien issue.</u>

(<u>Id.</u> at 27 (emphasis in Motion) (citing <u>C.H. Robinson Co. v. Alanco Corp.</u>, 97

CIV. 6018 (AJP), 2000 WL 101238, at *4 (S.D.N.Y. Jan. 28, 2000), <u>aff'd</u>, 239

F.3d 483 (2d Cir. 2001)).)   Special Counsel asserts that he (as well as Debtor's

counsel and PACA trust creditors) did exactly what the district court in C.H.

Robinson said must be done to avoid loss of counsel fees, namely filing a motion

for appointment of Special PACA Trust Counsel, giving notice to "all creditors,"

and obtaining a court order approving the appointment and payment of such

counsel from PACA trust funds.  (<u>Id.</u> at 23.)

There are several problems with Special Counsel's argument.  First,

and most obviously, the trial court in <u>C.H. Robinson</u> did not hold that if Mandell

would have moved early on in the case, he would have been entitled to attorney's

fees.  Quite the contrary, the passage Special Counsel cites makes clear that the

trial court only suggested that Mandell could have moved earlier to assuage his

concerns over his fees.  <u>See</u> <u>C.H. Robinson Co.</u>, 2000 WL 101238, at *4

("Moreover, <u>if Mandell really had been concerned</u> at whether he would be paid

from Alanco's PACA trust funds, he <u>could have</u> moved early in these cases, rather

than at their conclusion for a ruling on the attorney fee lien issue." (emphases

added)).  Special Counsel is essentially extrapolating one sentence from the trial

court's opinion to mean that moving for attorney's fees early in the case ensures

payment; such a reading, however, is overly generous.

Second, although the Second Circuit affirmed the trial court's denial of fees to Mandell, the Second Circuit did not credit the passage cited by Special Counsel, nor did the circuit court even hint at the possibility of an early motion to secure attorney's fees.  Instead, the court explained why the statute's text, purpose, and accompanying regulations <u>prohibited</u> using PACA trust funds to pay attorney's fees incurred in the collective accounts receivable held in trust for the beneficiary sellers.  <u>See</u> <u>C.H. Robinson</u>, 239 F.3d at 488 ("Allowing a defunct PACA trustee to pay other creditors with PACA funds before the seller is paid in full would frustrate [Congress's] purpose.").

In an effort to nullify this Court's reliance on <u>C.H. Robinson</u>, Special Counsel alternatively asserts that the Second Circuit later held that its decision in <u>C.H. Robinson v. Alanco Corp.</u> does not apply to payments from PACA trust assets that are authorized by the court.  (Answering Br. at 23 (citing <u>"R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.</u>, 467 F.3d 238 (2d Cir. 2006)).)  He posits that <u>"R" Best</u> "noted that counsel who was court-appointed, and acting for the benefit of PACA trust creditors, unlike a trustee, can be paid by PACA trust assets."  (<u>Id.</u> at 23 (citing <u>"R" Best</u>, 467 F.3d at 243).)  There are serious flaws in Special Counsel's arguments with respect to <u>"R" Best</u>.  Chief among the flaws is the contention that <u>"R" Best</u> held that a court-appointed "special counsel" or

21

"special master" can be paid by PACA trust assets.  Once again, Special Counsel's

argument wholly misconstrues a court's opinion.

      In <u>"R" Best</u>, a railroad company transported perishable agricultural

goods from various suppliers to P.J. Produce.  467 F.3d at 240.  P.J. Produce

eventually defaulted on payments to suppliers and the railroad.  <u>Id.</u>  As a result, the

railroad sued P.J. Produce to attempt to enforce the trust provisions of PACA.  <u>Id.</u>

The Second Circuit first found that the railroad did not qualify as a PACA trust

beneficiary because it was not a "seller of perishable agricultural commodities,"

only a transporter.  <u>Id.</u> at 241–42.  The court next considered the railroad's

common-law trust argument that administrative expenses should be paid from

PACA trust funds:

> Union Pacific primarily relies on two lower court decisions that
> allowed certain administrative expenses to be paid from PACA trust
> funds.  <u>See</u> <u>Six L's Packing Co., Inc. v. Post & Taback, Inc.</u>, 132 F.
> Supp. 2d 306, 309 (S.D.N.Y. 2001) (allowing a court-appointed
> Special Master's fees and expenses to be paid out of PACA trust
> funds).

<u>Id.</u> at 242–43.  The court held that the railroad could not rely on <u>Six L's Packing</u>

because it was not performing quasi-judicial duties.  <u>Id.</u> at 243.  The court noted

that "[t]he trust funds could be used to pay the Special Master's fees [in <u>Six L's</u>

<u>Packing</u>], in contrast, because the Special Master would be 'acting on the Court's

behalf in performing quasi-judicial duties and for the joint benefit of all . . . PACA

creditors."  <u>Id.</u>  The court found that "Union Pacific's position does not resemble

that of a Special Master or a trustee in bankruptcy.  It provided its services directly

to P.J. Produce, and did not act at the court's direction or for the exclusive benefit

of the PACA beneficiaries."  Id. (internal citations omitted)).

   While the "R" Best court did hint at the approval of Six L's Packing's

decision to allow a Special Master to be paid with PACA trust funds, the court's

distinguishing treatment of Six L's Packing is a far cry from the wholesale

adoption that Special Counsel advances.[7]  Instead, the court went to great lengths

to emphasize "Congress's intent to protect sellers as the exclusive beneficiaries of

the PACA trust."  Id.; see also id. at 242 ("[T]he legislative history and the text of

the statute as well as the implementing regulations all make clear that trust assets

are intended exclusively to benefit produce suppliers.").

   And even if "R" Best did rely on Six L's Packing, such reliance would

be highly suspect because Six L's Packing did not give any reasoned opinion as to

how or why the court allowed a special master to be paid from PACA trust funds.

There, the Southern District of New York appointed James Niss, Esq., as a

"Special Master" to assist the court in evaluating the PACA claims.  132 F. Supp.

2d at 309.  The court only stated that "[b]ecause the Special Master will be acting

on the Court's behalf in performing quasi-judicial duties and for the joint benefit of

all Post & Taback PACA creditors, his reasonable fees and expenses shall be paid

---

[7] Even West Publishing notes that "R" Best distinguished Six L's Packing.

from Post & Taback's PACA trust funds." Id.  The court did not provide any legal authority for authorizing such compensation from PACA trust funds.[8]

Accordingly, neither the trial court order in C.H. Robinson, nor the Second Circuit's opinion in "R" Best warrants a different decision.

### ii.    Common Law Trust Principles Do Not Apply

Admittedly, there are several courts that have not followed C.H. Robinson's reasoning and have instead relied on common law trust principles to allow for the payment of certain administrative expenses, such as attorneys' fees or fees for services rendered in collecting receivables for the benefit of the PACA trust, to be paid from the corpus of the PACA trust prior to its distribution to the statutory beneficiaries.  See, e.g., In re Milton Poulos, Inc., 947 F.2d 1351, 1353 (9th Cir. 1991); In re Southland + Keystone, 132 B.R. 632, 643 (9th Cir. BAP 1991); In re United Fruit & Produce Co., 119 B.R. 10, 13 (Bankr. D. Conn. 1990) ("[W]ell-settled trust law furnishes the basis for compensating a trustee, unless [PACA] otherwise provides.").  These cases generally require the claimant to demonstrate that its efforts and resultant expenses were "directly responsible for the availability of the funds from the [PACA] trust."  See, e.g., Milton Poulos, 947 F.2d at 1353.

---

[8] The Six L's Packing court only cited to Federal Rule of Civil Procedure 53(a), which authorizes a court to appoint a special master.  The court did not discuss any authority for compensating the special master with PACA trust funds.

For example, in <u>Milton Poulos</u> the Court of Appeals for the Ninth Circuit awarded attorneys' fees to the attorneys for a produce supplier because, "[t]hrough their efforts, the bankruptcy court declared the trust valid and enforceable, thereby permitting the funds to be [disbursed] among the trust [beneficiaries.]" <u>Id.</u> at 1353.  The court further explained that "the efforts of these attorneys resulted in a common fund for the group."  <u>Id.</u>

Similarly, in <u>United Fruit</u> the bankruptcy court relied on common law trust principles as well as 11 U.S.C. § 506, in compensating a bankruptcy trustee for its "necessary" services from the PACA trust funds prior to their distribution. 119 B.R. at 13 & n.5.  The court explained that "[t]he bankruptcy trustee of the debtor's estate . . . rendered substantial services in collecting the PACA receivable for the benefit of the PACA beneficiaries and in contesting [a seller's] claim that it is entitled to a priority payment from [the PACA trust.]" <u>Id.</u> at 13.  The court further explained that "[t]he non-PACA creditors should not pay for these services and the trustee should not be forced to donate them."  <u>Id.</u>

The court in <u>Southland + Keystone</u>, in harmony with the court in <u>United Fruit</u>, similarly allowed the trustee "to offset [from PACA trust fund monies] its collection costs."  132 B.R. at 643.  The court, however, limited the amount of the offset "to the 'hard' costs of collection such as outside attorney's fees and expenses that were necessary to the collection effort," and stated that costs

25

such as "overhead expenses are not recoverable." Id.

The Fifth Circuit has not yet decided whether or not the common law trust principles would permit the recovery of attorney's fees as in the aforementioned three cases. See Golman-Hayden Co., 217 F.3d at 353. There, the court noted that "[a] party may be entitled to attorney's fees from a common fund when acting to either protect the trust from destruction or to restore it to its purpose." Id. at 352. However, because the litigation did not result in the establishment of a common fund, the Fifth Circuit concluded that the district court erred in awarding attorney's fees under the common fund exception. The court "expressed no opinion as to whether the common fund exception would permit the recovery of attorney's fees under PACA if a common fund was established. That decision remains for another day." Id. at 353.

But even in the absence of any Fifth Circuit explicit guidance, the aforementioned three cases permitting a special counsel's attorney's fees are easily distinguishable in light of the fact that PACA is a statutory trust, and as such, common law trust principles, like those relied upon in United Fruit, are not applicable if they conflict with the language of the statute. C.H. Robinson, 239 F.3d at 487 ("[C]ommon law trust principles are not applicable if they conflict with the language of the statute, the clear intent of Congress in enacting the statute, or the accompanying regulations."); accord "R" Best Produce, Inc., 467 F.3d at 242;

26

Pac. Intern. Mktg, Inc., 462 F.3d at 285; Boulder Fruit Exp. & Heger Organic Farm

Sales v. Trans. Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001).  Here, because

PACA's § 499e(c)(2) unambiguously entitles PACA beneficiaries to full payment

(i.e., a sum certain) before payment of any other creditor, United Fruit's reliance

on common law trust principles to pay the individual charged with administering

the PACA trust funds ahead of the PACA beneficiaries is misplaced.  While it is

understandable that "non-PACA creditors of the estate should not pay for [PACA

administration] services" and individuals adjudicating such claims "should not be

forced to donate them," United Fruit, 119 B.R. at 10, the language of PACA

unequivocally requires tendering "full payment" to PACA beneficiaries before

paying any other creditor, even a creditor charged with administering the PACA

trust like Special Counsel, see C.H. Robinson, 239 F.3d at 488 ("PACA trust

beneficiaries are entitled to full payment before trustees may lawfully use trust

funds to pay other creditors.").

> iii.   No Distinction Between Litigating PACA Claims in
> Bankruptcy Court and in District Court

Amicus argues that this Court's previous Order vacating the

bankruptcy court's grant of Special Counsel's First Interim Application for Fees

(Case No. 5:12-cv-1127, Dkt. # 23) has "real and serious consequences for the

administration of these cases resulting in losses for PACA trust creditors."

(Amicus Br. at 1.)  Essentially Amicus posits that because the Court prohibits

27

trustees and/or special counsels from receiving any payment in PACA cases and in

most cases the PACA trust payables exceed the PACA trust receivables, trustees

and/or special counsels are left between "a rock and a hard place": he or she can

either "abandon the PACA trust assets, thereby leaving each creditor to fend for

itself and creating a multiplicity of litigation or attempt to collect the PACA

receivables with the attendant risk that the attorney's fees and expenses expended

may be unrecoverable."  (Id. at 3.)  Amicus then provides a "parade of horribles"

that will result if this Court does not vacate its earlier opinion:

> Instead of protecting PACA trust creditors, the Order has resulted in a
> paralysis of the collection efforts in these bankruptcy proceedings to
> the detriment of both the PACA debtors and their PACA creditors.
> By making the PACA receivables of a Debtor uncollectable, it
> prevents the PACA creditors from realizing any value from the
> collection of their PACA trust receivables because even a court
> authorized collector acts at his financial peril.  This enables
> unscrupulous downstream parties to slow pay the PACA debtor,
> possibly even create or force the debtor into bankruptcy and reap a
> windfall because there is no ability of the debtor to collect its
> receivables.

(Id.)

However, Amicus' argument is not new.  In In re Super Spud, Inc., 77

B.R. 930 (Bankr. M.D. Fla. 1987), the court considered a nearly identical

contention:

> Because the claims of PACA creditors far exceed the amount of assets
> in the estate, the trustee has argued that the position this court has
> taken is unfair in that it fails to compensate the trustee for his efforts
> in collecting the estate's assets.  This, he argues, obligates him to

> collect the estate's assets for the benefit of the PACA trust
> beneficiaries with no reimbursement for his own expenses.

Id. at 932.  In rejecting the trustee's argument, the court acknowledged the

perceived "injustice," but reminded that it is bound by the law as written:

"While this result is unfortunate, this court can find no support for the trustee's

argument that the PACA claims be subordinated to that of the trustee.  Perhaps this

is something Congress should address in the future."  Id.

       Moreover, given Congress's unmistakable mandate that buyers must

tender "full payment" to PACA beneficiaries and that PACA is not a bankruptcy

statute, the fact that a buyer has ended up in bankruptcy (and perhaps in need of an

individual to resolve the arduous PACA collection efforts) does not change the

"full payment" directive.  In fact, "[u]nder PACA, it is unlawful for buyers of

produce, inter alia, to fail to make prompt payment for a shipment of produce."

Idahoan Fresh, 157 F.3d at 199.  While it is unfortunate that Delta Produce

accumulated numerous PACA claims (by not tendering full payment that was

owed to the PACA beneficiaries in a timely fashion) and was compelled to declare

bankruptcy, Delta Produce's misfortune does not necessitate appointing a special

counsel to adjudicate the numerous PACA claims and then charging the PACA

beneficiaries for the special counsel's services before satisfying their claims.

"Courts have recognized that the intent to Congress in enacting PACA's trust

provision was to provide unpaid produce sellers with greater protection from the

risk of default buyers." C.H. Robinson, 239 F.3d at 488 (emphasis added)
(citations omitted); accord In re Kornblum, 81 F.3d at 283 (holding that Congress
enacted the trust provision "to broaden the protection afforded to produce
suppliers").  Solely because Delta Produce has many PACA claims to pay out does
not mean that the PACA beneficiaries should have to pay for Delta Produce's lack
of timely payment before receiving what is owed to them.

      iv.   Paying to Adjudicate PACA claims

      The logical question that likely follows is: who should pay to
adjudicate the PACA claims?  Again, admittedly there is some logic in United
Fruit's equitable holding that "[t]he non-PACA creditors of [the bankruptcy] estate
should not pay for these services and the trustee should not be forced to donate
them."  119 B.R. at 13.  At first blush, it does seem inequitable to make non-PACA
creditors of the estate "pay" for legal services rendered in adjudicating PACA
claims.  However, if the buyer was not in bankruptcy, the buyer would certainly
use its own assets to pay for the services rendered in adjudicating PACA claims
and tendering full payment to the sellers (PACA beneficiaries)—assets of which
could have been used to pay bankruptcy estate creditors.  Given that PACA is not a
bankruptcy statute, and indeed functions as the controlling statute should there be a
conflict with the Bankruptcy Code, see In re Superior Tomato-Avocado, 481 B.R.
866, 872 (Bankr. W.D. Tex. 2012), it makes little sense to change how buyers pay

for services rendered in paying out PACA claims simply because the buyer is in bankruptcy.

The Court also emphasizes that Special Counsel <u>can</u> be paid from the PACA trust res, but only after PACA trust beneficiaries receive full payment.  <u>See C.H. Robinson</u>, 239 F.3d at 488 ("PACA trust beneficiaries are entitled to full payment before trustees may lawfully use trust funds to pay other creditors."); <u>see also id.</u> ("A PACA trustee may use trust assets to pay ordinary business expenses as long as it does not do so at the expense of its PACA beneficiaries, or in any way impair the ability of the beneficiaries to collect money owed in connection with produce sales.").

Accordingly, PACA contemplates two options for Special Counsel to receive payment (or for a PACA trustee to receive payment): (1) he can seek payment from the buyer/debtor, or (2) he can seek payment from the PACA trust, but <u>only after all PACA beneficiaries have received full payment</u>.

In this case, Special Counsel could seek his attorney's fees from Delta Produce because it was Delta Produce's task, as the PACA trustee, to tender "full payment" to the PACA beneficiaries.  The fact that Special Counsel assumed Delta Produce's role and expended valuable time and resources to do so warrants Delta Produce paying for Special Counsel's services.  Alternatively, assuming there are additional funds in the PACA trust res, an unlikely but not impossible scenario,

31

Special Counsel could receive his payment from those excess funds.

    v.  <u>Appointment of Special Counsel</u>

    The Court appreciates why the bankruptcy court found it efficacious to appoint a special counsel in the instant litigation; indeed, there were a large number of PACA beneficiaries that Delta Produce held trust assets for, and adjudicating each PACA claim would be been a time-intensive effort.  However, PACA and its accompanying regulations likely did not envision the appointment of a "special counsel" or "special master" for PACA claims because PACA imposes a fiduciary obligation on the <u>trustee</u> in maintaining and paying out PACA claims— an obligation that a special counsel or special master does not have.

    To illustrate, PACA imposes fiduciary duties on the buyer.  <u>See</u> <u>Matter of Snyder</u>, 184 B.R. 473, 475 (Bankr. D. Md. 1995) ("PACA, then, imposes fiduciary duties on the buyer.").  This is because the buyer holds the produce and its assets and derivatives in trust:

> An individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act . . . [A] PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier.

<u>Id.</u> (quoting <u>Morris Okun, Inc. v. Harry Zimmerman, Inc.</u>, 814 F. Supp. 346, 348 (S.D.N.Y. 1993)).  The fiduciary duties arise "immediately upon delivery of the produce," in which a "nonsegregated 'floating' trust [arises] in favor of unpaid

sellers, which attaches to the products themselves and any proceeds." Bocchi
Americas Assocs. Inc., 515 F.3d at 388. The fiduciary duties remain "until full
payment of the sums owing in connection with such transactions has been
received" by the unpaid seller (i.e., the PACA beneficiary). 7 U.S.C. § 499e(c)(2).
During the course of the fiduciary relationship, "the buyer must 'maintain trust
assets in a manner that such assets are freely available to satisfy outstanding
obligations to the sellers' and 'dissipation of trust assets is unlawful.'" Matter of
Snyder, 184 B.R. at 475 (quoting 7 C.F.R. § 46.46(e)).

    These fiduciary duties include paying PACA beneficiaries the full
payment of their PACA claim. See C.H. Robinson, 239 F.3d at 488 ("[A] PACA
trustee has a fiduciary obligation to repay the full amount of the debt owed to a
PACA beneficiary."); see also In re Watford, 374 B.R. 184, 191 (Bankr. M.D.N.C.
2007) ("Pursuant to the statutory trust imposed by PACA, Southern Solutions had a
fiduciary duty to preserve the PACA Trust Assets for the benefit of its unpaid
produce suppliers until they were paid in full."). "The accompanying regulations
also indicate that PACA trustee have a duty under PACA to pay the full amount of
the debt owed to their produce suppliers." C.H. Robinson, 239 F.3d at 487. For
example, the regulations mandate that buyers are required to maintain trust assets
in a manner that such assets are freely available to satisfy outstanding obligations
to sellers. 7 C.F.R. § 46.46(d). Additionally, the regulations proscribe

33

"dissipating" trust assets by acting or failing to act in any way "which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid [sellers] to recover money owed in connection with produce transactions." Id. § 46.46(a)(2).

However, a "special counsel" or "special master" does not have those same fiduciary obligations as a trustee would have.  In fact, in the absence of those obligations, it is conceivable that a special counsel or special master could improperly dissipate trust assets—an action that would make a PACA trustee personally liable, see Morris Okun, 814 F. Supp. at 348 ("An individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for the tortious act.")—but would not make a special counsel or special master liable.

Moreover, Congress intended that maintaining and paying out PACA claims would be subject to such fiduciary obligations.  The statutory text clearly states that the trust relationship (with the corresponding fiduciary obligations) arises as soon as the produce is tendered and remains until the seller receives full payment.  7 U.S.C. §499e(c)(2).  Appointing a special counsel or special master to

34

essentially fulfill the role of the buyer/trustee seems perverse in light of

§ 499e(c)(2)'s fiduciary obligations.[9]

III.    No Express or Implied Consent

Special Counsel next argues that because Kingdom Fresh was "served

with the motion to establish the PACA Order via ECF," "participated in the

negotiations of the PACA Order," and "made an appearance at the hearing on the

PACA Order," it expressly consented to the use of PACA trust funds to pay

Special Counsel.  (Answering Br. at 16.)

Special Counsel's argument suffers from several flaws.  Express

consent is "consent that is clearly and unmistakably stated."  Black's Law

Dictionary (9th ed. 2009).  The three situations Special Counsel advances fall short

of express consent.  First, being served with a motion plainly does not constitute

express consent.  Second, although Special Counsel contends that Kingdom Fresh

"participated in the negotiations of the PACA Order," this statement is an

inaccurate reflection of the record.  Kingdom Fresh and the other PACA claimant

---

[9] Here, Special Counsel was tasked with many of the same duties that a trustee
would perform, including: "tak[ing] those steps reasonably necessary to preserve
and collect the PACA trust assets" and "facilitat[ing] the distribution of the
collected PACA trust assets" by "(a) attempting to determine the extent to which
assets are PACA trust assets, including filing or defending adversary proceedings
including declaratory judgment actions, (b) examining PACA trust claims filed by
alleged PACA trust beneficiaries, and objecting to those claims where appropriate,
(c) collecting the Debtors' accounts receivables, including filing adversary actions,
and (d) liquidating PACA trust assets other than the accounts receivables into
cash."  (Bankr. Dkt. # 52 at 8–9.)

Appellants were not parties to Delta Produce's Motion to Appoint Special Counsel and did not affirmatively state their consent to the PACA Order authorizing the payment of Special Counsel's fees from PACA trust funds during the January 24, 2012 hearing.  Third, making an appearance at the hearing and failing to object does not equate to express consent.  See C.H. Robinson Co., 2000 WL 101238, at *6 ("Robinson's counsel's silence did not amount to a promise to allow [debtor's counsel as trustee] to recover his fees from the PACA trust.").

Special Counsel otherwise argues that Kingdom Fresh impliedly consented to paying his fees from PACA trust funds.  (Answering Br. at 16–18.) He relies on the bankruptcy court's comments that it would have expected "vociferous objection" and "relief from this appellate court" if Kingdom Fresh had opposed the PACA Order.  (Id. at 17 (citing First Interim Fee Hr'g 40:17–19 (September 21, 2012 transcript)).)  He also relies on the court stating, "[I]f there were aggr[ieved] parties . . . it was incumbent on those parties to speak up . . . ." (Id. (citing First Interim Fee Hr'g 41:11–14))

First, even when these comments were made at the September 21, 2012 hearing, they do not appear to be directed at whether Kingdom Fresh had impliedly consented to Special Counsel's appointment or paying his fees from PACA trust funds.  Rather, they reflect the bankruptcy court's concern regarding whether Kingdom Fresh had impliedly consented to the bankruptcy court's

36

adjudicative authority.  The entire passage containing Special Counsel's cited

provisions reads:

> Similarly, this Court entered an order, pursuant to the district court's
> order of reference, believing itself duly entrusted with the necessary
> judicial power to do so by the district court's orders of reference.  And
> this Court, in reliance on those orders, said, well, then it's my job, and
> as I say, I don't have the authority to say no, so I'm going to do my
> job.  And once again, if there were aggrieved parties who believed
> that, in doing my job, I was doing something wrong, once again, I
> think it was incumbent on those parties to speak up and say so, lest we
> get down the road and find, after we'd done all that work and spent all
> that time and money, that we'd have to do it all over again, <u>in another
> court</u>.

(First Interim Fee Hr'g 41:4–18 (emphasis added).)

Second, Special Counsel incorrectly characterizes these statements as

having occurred "at the time of the [PACA] Order"—implying that the bankruptcy

court made these caveats before Special Counsel's initial appointment and

Kingdom Fresh must have impliedly consented by not objecting to paying Special

Counsel's fees with PACA trust funds.  (Answering Br. at 17–18.)  However, the

passages that Special Counsel cites are from the <u>September 21, 2012</u> hearing on his

First Interim Application for Fees—not the original January 24, 2012 hearing on

the PACA Order authorizing his appointment and fee structure.  The transcript for

the January 24, 2012 hearing does not contain any affirmative warning to Kingdom

Fresh's counsel regarding Special Counsel's appointment or his fee structure.

Therefore, Special Counsel's arguments that Kingdom Fresh impliedly consented

to paying his fees out of the PACA trust and that the bankruptcy court must have accepted such implied consent are unpersuasive, if not entirely misleading.

But even if the bankruptcy court had suggested that PACA claimants, such as Kingdom Fresh, should "speak up or forever hold their peace" before equitably estopping Kingdom Fresh from challenging Special Counsel's fees, that admonition is irrelevant in the context of PACA because Kingdom Fresh's attorneys could not have waived Kingdom Fresh's PACA "sum certain" trust rights without Kingdom Fresh's express written consent.  To illustrate, Congress enacted PACA to "provide unpaid produce sellers with greater protection from the risk of default by buyers."  C.H. Robinson, 239 F.3d at 488.  PACA "was established by Congress to protect sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received."  In re Southland + Keystone, 132 B.R. at 639.  Because PACA claimants maintain a "superpriority" status, an agent for a PACA claimant cannot waive a PACA claimant's rights absent an express written waiver by the PACA claimant clearly showing the PACA claimant intended to waive its rights under the PACA.  See In re Cafeteria Operators, L.P., 299 B.R. 411, 419 (N.D. Tex. 2003) ("The regulations under PACA are clearly intended to prevent an agent from doing any act that would waive its principal's rights under PACA without an express written waiver by the principal clearly showing the principal's intent to waive its rights under PACA.").  As § 46.46(c)(2)

38

makes clear,

> Persons acting as agents also have the responsibility to negotiate contracts which entitle their principals to the protection of the trust provisions: Provided, That a principal may elect to waive its right to trust protection.  To be effective, the waiver must be in writing and separate and distinct from any agency contract, must be signed by the principal prior to the time affected transactions occur, must clearly state the principal's intent to waive its right to become a trust beneficiary on a given transaction, or a series of transactions, and must include the date the agent's authority to act on the principal's behalf expires.

7 C.F.R. § 46.46(c)(2).  Further, under § 46.46(d)(2),

> Agents who sell perishable agricultural commodities on behalf of a principal are required to preserve the principal's rights as a trust beneficiary as set forth in § 46.2(z), (aa) and paragraphs (d), (f), and (g) of this section.  Any act or omission which is inconsistent with this responsibility, including failure to give timely notice of intent to preserve trust benefits, is unlawful and in violation of Section 2 of the Act, (7 U.S.C. § 499b).

Id. § 46.46(d)(2).

    Pursuant to these regulations, any "implied consent" that Kingdom Fresh's attorneys gave by failing to object to the bankruptcy court's order authorizing payment of Special Counsel's fees from PACA trust funds is irrelevant because the regulations clearly require PACA claimants to give express, written consent before abdicating PACA trust rights to full payment.  In the absence of written consent from PACA claimants themselves, their agents and/or attorneys were unable to waive PACA claimants' "sum certain" trust rights by impliedly agreeing to pay Special Counsel's fees out of PACA trust funds.

IV.   <u>No Waiver of Objection</u>

      Special Counsel alternatively argues that Kingdom Fresh should be estopped from challenging Special Counsel's Third and Final Fee Application because "Kingdom Fresh Group has never made an objection or reference to the propriety of the underlying fees and costs contained in any of Special Counsel's three fee applications."  (Answering Br. at 14.)   Essentially, Special Counsel argues that Kingdom Fresh should not be permitted to file the instant appeal challenging his Third and Final Fee Application because Kingdom Fresh truly attacks the substance of the PACA Order authorizing Special Counsel's fees, which was filed on January 25, 2012, well before the instant appeal was filed.

      Again, at first blush, Special Counsel's argument appears logical.  He takes issue with Kingdom Fresh's receipt of the benefits of his work as Special Counsel and then its perceived "attempt[] to get out of paying for its agreed share of Special PACA Counsel's fees."  (<u>Id.</u> at 13.)  However, Special Counsel's waiver argument still fails for several reasons.

      First, and perhaps most importantly, Kingdom Fresh did not join in the proposed PACA Claim Procedure filed in bankruptcy court on January 19, 2012, which included the appointment of Special Counsel Craig A. Stokes

("Special Counsel") to adjudicate PACA claims.  (Bankr. Dkt. # 31.)  Several

PACA claimants—but not Kingdom Fresh—agreed to the motion.[10]

   Second, while Kingdom Fresh did appear at the expedited hearing set

only five days after the proposed PACA Claim Procedure motion was filed, it only

had <u>two days</u> to prepare for the expedited hearing.  (See Bankr. Dkt. # 44 (Notice

of Expedited Hearing sent to PACA Trust Beneficiaries of Delta Produce on

January 22, 2012).)  The fact that Special Counsel now argues that it was

incumbent upon Kingdom Fresh to affirmatively raise objections to the PACA

claims procedure at the hearing after only receiving two-days' notice strains

credulity.[11]

   Third, Kingdom Fresh did take issue with Special Counsel's First

Interim Fee Application and timely filed objections and an appeal to Special

Counsel's first request for fees.  (<u>See</u> Bankr. Dkt. ## 294, 340; Case No. 5:12-cv-

1127, Dkt. # 13.)  Kingdom Fresh made such objection less than eight months after

Special Counsel had been appointed by the bankruptcy court.  (<u>Compare</u> Bankr.

Dkt. # 56 (PACA Order issued on January 25, 2012), <u>with</u> Bankr. Dkt. # 294

---

[10] The PACA Claimants that did agree to the motion include: Wilson Davis Co.;
Averrit Brokerage Co., Inc.; A&A concepts, LLC; Greenhouse Produce Company,
LLC; Juniper Tomato Grower, Inc.; Mecca Family Farms, Ltd.; London Fruit, Inc.;
Triple H Produce, LLC; and The Pumpkin Patch, LLP.  (Bankr. Dkt. # 31 at 9.)

[11] In fact, it appears that Kingdom Fresh did not formally appear in the litigation
until February 23, 2012—nearly a month after the PACA Order was filed.  (See
Bankr. Dkt. # 113 (Motion to Admission Pro Hac Vice for Kingdom Fresh).)

(Kingdom Fresh's Objections to Special Counsel's First Interim Application for Fees filed on September 4, 2012).)

Accordingly, the Court is unpersuaded by Special Counsel's arguments that Kingdom Fresh waived any objection to the payment of PACA trust funds to pay Special Counsel's fees. Kingdom Fresh challenged Special Counsel's fees at an appropriate time.

V.    Conflict of Interest

Kingdom Fresh contends that this Court should not only vacate the bankruptcy court's order granting Special Counsel his request for fees, but should also require Special Counsel to disgorge all of the fees he has been paid to date by the other PACA beneficiaries that did not object to his fees. (Opening Br. at 18–24.) It asserts that because Special Counsel created an actual conflict of interest pursuant to 11 U.S.C. § 328(c), he should be denied all compensation. (Id. at 18.) Special Counsel counters that his appointment under 11 U.S.C. § 327(e) is an exception to 11 U.S.C. § 328(c). (Answering Br. at 22.)

Section 328(c) provides:

(c) Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c).  As this section makes clear, appointments under Section 327(e) are excepted.  Here, Special Counsel was appointed to serve as Delta Produce's § 327(e) counsel.[12]  (See Bankr. Dkt. ## 118, 176.)   Therefore, the prohibition in § 328(c) does not apply.

Kingdom Fresh next contends that because Special Counsel represented Debtors (as their § 327(e) counsel) and represented PACA beneficiaries at a settlement mediation, his "conflict of interest" warrants denying his attorney's fees.  (Opening Br. at 19–21.)  Special Counsel argues that because the bankruptcy court specifically found that he did not have a conflict of interest, Kingdom Fresh's argument is without merit.  (Answering Br. at 21.)

"There is a general consensus that existence of an 'actual' conflict of interest between an attorney's clients requires denial of all of the professional's legal fees because of the improper dual representation."  In re Howell, 148 B.R. 269, 270 (Bankr. S.D. Tex. 1992) (citing Woods v. City Nat'l Bank & Trust, 312

---

[12] Section 327(e) provides for appointment of special counsel under certain criteria:

> The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such an attorney does not represent or hold any interest adverse to the debtor or to the debtor's estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

U.S. 262, 267 (1941); <u>In re EWC, Inc.</u>, 138 B.R. 276, 281–83 (Bankr. W.D. Okla.

1992)); <u>see also</u> <u>In re Land</u>, 116 B.R. 798, 803 (D. Colo. 1990); <u>BH & P, Inc.</u>, 103

B.R. 556 (Bankr. N.J. 1989).  An attorney who fails to remain free of conflicts, or

one who serves conflicting interests during a case may be denied all compensation.

"A conflict exists when an attorney represents both a creditor and debtor."  <u>In re</u>

<u>Wilde Horse Enters.</u>, 136 B.R. 830, 843 (Bankr. C.D. Cal. 1991) (citing <u>In re</u>

<u>Roberts</u>, 46 B.R. 815, 823 (Bankr. Utah 1985)).

       Here, however, PACA contemplates a mingling of interests.  If in

bankruptcy, the debtor holds the trust assets for the benefit of its creditors: the

PACA beneficiaries.  <u>See, e.g.</u>, <u>In re Kornblum</u>, 81 F.3d at 284–95 (describing how

a debtor holds equitable title to the PACA trust res for the benefit of a creditor);

<u>see also</u> In re Bartlett, 397 B.R. 610, 623 (Bankr. D. Mass. 2008) (describing how

the debtor had a duty to preserve the PACA trust for the benefit of the PACA

beneficiaries).  Naturally, the debtor—though it holds a fiduciary obligation to the

PACA beneficiaries as the PACA trustee—retains at least some adverse interests

by virtue of the fact that it is the debtor and owes money (that it does not have) to

various creditors.  However, any perceived "conflict" was purposeful—Congress

intended to provide the trust remedy as a means to prevent buyers from granting

non-PACA creditors a security interest in their inventory.  <u>Pac. Intern. Mktg.</u>, 462

F.3d at 282.  By making the buyer/debtor the trustee of the PACA trust (and thus

necessitating the fiduciary obligation), Congress fulfilled its intent to "protect small farmers and growers who were vulnerable to the practices of financially irresponsible buyers." Id.

Kingdom Fresh essentially takes issue with how Special Counsel was charged with effectively representing Debtor Delta Produce's interests at times and PACA beneficiaries at other times. (Opening Br. at 20.) It emphasizes that it is absurd to have PACA beneficiaries pay for Special Counsel's efforts in adjudicating the PACA claims because Special Counsel filed objections to the PACA beneficiaries' claims, which clearly constitute adverse efforts. (Id.)

However, the Court need not substantively address Kingdom Fresh's conflict argument because as the Court has outlined extensively above, PACA does not authorize the payment of Special Counsel's—or a trustee's—fees out of PACA trust funds prior to the satisfaction of the PACA beneficiaries' claims. Therefore, Kingdom Fresh's concern is allayed by PACA's mandate that all PACA beneficiaries are entitled to "full payment" before payment can be made to any other creditor, and here it is undisputed that the PACA beneficiaries would not have received full payment if Special Counsel's fees were paid.

<u>CONCLUSION</u>

For the aforementioned reasons, the Court **VACATES** the bankruptcy court's order granting Special Counsel's Third and Final Fee Application.

**IT IS SO ORDERED.**

**DATED**: San Antonio, Texas, September 22, 2014.

_____

David Alan Ezra
Senior United States Distict Judge